UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DOMINION ASSETS LLC,

      Plaintiff,

v.

MASIMO CORPORATION, et al.,

      Defendants.

Case No.  12-cv-02773-BLF

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING**

[Re:  ECF No. 68]

This is a lawsuit for patent infringement brought by plaintiff Dominion Assets LLC ("Plaintiff") on May 30, 2012.  Almost a year and a half after its inception, defendants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Defendants") seek to dismiss the case on the ground that Plaintiff lacked legal title to—and accordingly the legal standing to enforce— the patents-in-suit on the day Plaintiff filed the Complaint.[1]  (Def.'s Mot. to Dismiss, ECF 68, 82)[2] Plaintiff and Defendants respectively filed timely opposition and reply.  (Pl.'s Opp., ECF 77; Def.'s Reply ECF 85)  On June 5, 2014, the Court heard oral argument on the motion, after which it took the matter under submission.  Having carefully considered the parties' written submissions and oral argument of counsel, for the reasons stated below, the Court GRANTS Defendants'

---

[1] Although Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) was filed well after the service of responsive pleadings, "the deadline for making a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is prolonged by Rule 12(h)(3), which provides that '[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.'"  *Wood v. City of San Diego*, 678 F.3d 1075, 1082 (9th Cir. 2012) (quoting Federal Rule of Civil Procedure 12(h)(3)).

[2] Where appropriate, references are made to the unredacted documents that Defendants filed into the record on May 22, 2014.  (ECF 82, 83)

United States District Court
Northern District of California

1    Motion to Dismiss without leave to amend.

2    **I.    BACKGROUND**

3        On May 30, 2012, Plaintiff filed the instant lawsuit, alleging that Defendants infringe three

4    of its patents directed toward methods of non-invasively determining blood analyte (constituent)

5    concentration: U.S. Patent Nos. 5,379,764 (the "'764 Patent"), and 5,460,177 (the "'177 Patent")

6    (collectively, "patents-in-suit").[3]  (Compl. ¶ 1, ECF 1)  The patents-in-suit identify Diasense, Inc.

7    as the assignee.  (*Id.* Exhs. A-C)  Plaintiff alleges that it holds the title to each patent by

8    assignment from Diasense, including "the right to sue for past, present and future damages."

9    (Compl. ¶¶ 12-14)  Although Defendants do not admit the truth of this allegation, the present

10   motion to dismiss centers on what Plaintiff did with its patent rights after it allegedly obtained title

11   from Diasense.

12       Based on documents unearthed in discovery, it appears that in 2010 Plaintiff entered into

13   an agreement with third party Acacia Patent Acquisition LLC ("Acacia" or "APAC") for the

14   purpose of monetizing the patents-in-suit ("Assignment Agreement").  (Decl. of Irfan A. Lateef

15   Exh. 14, ECF 83 (hereinafter "Assignment Ag."); *see also* Pl.'s Opp. 1:14-15; Decl. of Keith

16   Keeling ¶ 4, ECF 79)  The Assignment Agreement, signed on December 10, 2010, identifies

17   Plaintiff, the assignor, as the "sole and exclusive owner of the U.S. Patents listed in Exhibit A"

18   and explains that "Assignor desires to sell to APAC all of Assignor's right, title and interest in and

19   to the Patents."  (Assignment Ag., at 1)  The patents-in-suit are all listed in Exhibit A to the

20   agreement and fall within the agreement's definition of "Patents."  (*Id.*, at 12)

21       With respect to the assignment of patent rights, the Assignment Agreement states:

22           Effective immediately upon the date of Acceptable Completion as
             set forth in Section 1.3 below, Assignor assigns, conveys, transfers
23           and sells to APAC, or APAC's designated Affiliate (as defined
             below) if APAC transfers or assigns its interest in this Agreement
24           per Section 9.2 herein, the entire right, title, and interest in and to the

25   _____

26   [3] On June 25, 2014, the parties stipulated to the dismissal with prejudice of Plaintiff's claims with
     respect to a third patent: U.S. Patent No. 5,360,004 (the "'004 Patent").  (ECF 94)  As such, the
27   '004 Patent is not treated as a patent-in-suit for purposes of this order.

28
     Case No. 12-cv-02773-BLF
     ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING

1

2

3

4

> Patents, including without limitation, all rights of Assignor to sue for past, present and future infringement of the Patents . . . . Assignor shall execute and deliver to APAC (or APAC's designated Affiliate) a separate Assignment, which is attached hereto as Exhibit B, and such other documents as APAC (or APAC's designated Affiliate) shall reasonably require in order to comply with the terms set forth in this Agreement.

5

6

7

8

9

10

(*Id.* § 1.1)  Section 1.3 provides that Acacia must, after a short diligence period, notify Plaintiff in writing of "Acceptable Completion" in order for the Assignment Agreement to continue in full force.  (*Id.* § 1.3)  Exhibit B to the agreement is titled "Assignment," and notes at the bottom that the documents is "For USPTO Recording."  (*Id.*, at 14)  Additionally, the agreement contains a survival clause, which states: "Upon termination of this Agreement, the rights granted to APAC shall automatically terminate and such rights shall revert to Assignor."  (*id.* § 9.7)

11

12

13

14

15

16

17

After executing the Assignment Agreement, Acacia provided notice of Acceptable Completion on December 17, 2010.  (Lateef Decl. Exhs. 19, 21, ECF 83-5, 83-7)[4]  Around that time, the contracting parties also discussed executing the separate assignment in Exhibit B, but Acacia's Business Development Manager, Michael Zhang, told Plaintiff's Managing Director, Keith Keeling, to "hold off on that part as we will provide an updated copy when the time is appropriate."  (Lateef Decl. Exh. 30, ECF 83-14)  Exhibit B was never executed.  (Keeling Decl. ¶ 5; *see also* Pl.'s Opp. 3 n.4)

18

19

20

21

22

23

Approximately fifteen months later, on March 30, 2012, Plaintiff informed Acacia in writing that it was "terminating the agreement effective immediately."  (Lateef Decl. Exhs. 15, 16, ECF 83-1, 83-2)  The stated reason for this termination was Acacia's failure to "enforce[] the patents subject to the agreement or [make] any progress to monetize the patents."  (*id.*; *see also* Keeling Decl. ¶¶ 6-7)  Acacia's response to this termination letter is unclear, as there is a gap in the documentary record from March 30 to about April 26, 2012.  To fill this gap, Plaintiff

24

25

26

27

---

[4] It appears that Acacia notified Plaintiff of Acceptable Completion after the period of time identified in the Assignment Agreement.  Acacia notified Plaintiff that its notice would be late, and Plaintiff appears to have accepted an extension of the deadline.  (Lateef Decl., Exh. 21; *see also* Lateef Decl. Exh. 24, at 220:5-8, April 15, 2014, ECF 83-9)  The parties have not argued that this untimely notification is relevant or material to Plaintiff's assignment of patent rights to Acacia.

28

3

submitted a declaration from Mr. Keeling testifying that "[i]n April and May 2012, Acacia agreed to terminate and discontinue performance under the Agreement." (Keeling Decl. ¶ 8; *see also* Lateef Decl. Exh. 24, at 253:15-254:3, Apr. 15, 2014, ECF 83-9 (hereinafter "Keeling Dep.")) Plaintiff also submitted a declaration from Darren Miller, Acacia's Vice President of Contracts, stating:

> In April and May of 2012, Acacia considered its options regarding its relationship with Dominion in light of Mr. Keeling's March 30, 2012 notice of termination. Based on that notice and the discussions that followed, by May 30, 2012, Acacia determined that Dominion had no desire for Acacia to continue its performance under the agreement and Acacia complied with the request.

(Decl. of Darren Miller ¶ 3, ECF 80)

What is clear is that on April 30, 2012, Mr. Zhang sent to Mr. Keeling, by email, "our language for terminating our original assignment agreement." (Lateef Decl. Exh. 20, ECF 83-6) The proposed termination language included provisions for Plaintiff's acceptance of encumbrances placed on the covered patents, (Lateef Decl. Exh. 18, § 1.3, ECF 83-4), as well as Plaintiff's release of all claims against Acacia relating to the underlying assignment agreement, the encumbrances, and the covered patents, (*id.* §§ 2.1-2.2). Plaintiff did not sign Acacia's proposed termination agreement due to these additional provisions requested by Acacia, (Keeling Decl. ¶ 8), and the contracting parties scheduled a conference call for May 30, 2012 in order to "discuss any questions you may have on the termination language." (Lateef Decl. Exh. 20) On May 30, 2012, Plaintiff filed the instant lawsuit. (*see* Compl.)

It was not until almost two years later that Plaintiff and Acacia finally executed a written "Termination and Assignment Agreement." (Lateef Decl. Exh. 28, ECF 83-13 (hereinafter "Term. Ag.")) The Termination Agreement purports to terminate the underlying assignment agreement "[a]s of the Effective Date," (*id.* § 1.1), which is defined as "the date on which the last Party executes this Agreement below," (*id.*, at 1). Plaintiff signed the Termination Agreement on April 14, 2014 and Acacia signed on April 18, 2014, making that agreement effective on the latter date. (*Id.*, at 3) The assignment back provision states that Acacia, as assignor:

Case No. 12-cv-02773-BLF
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING

United States District Court
Northern District of California

1
2
3
4

> hereby does transfer and assign unto Dominion all of Assignor's rights, obligations and interests in and to the Returned Patents including, without limitation, all rights of Assignor to sue for and collect past, present, and future damages and the right to all past, present, and future claims or causes of action for damages or equitable relief for infringement of the Returned Patents, subject to any and all Encumbrances.

5

(*Id.* § 1.2)  The "Returned Patents" are identified in Exhibit A to the Termination Agreement,

6

which lists the patents-in-suit.  (*Id.*, at 4)  Additional provisions provide for Plaintiff's acceptance

7

of encumbrances placed on the Returned Patents, including "those granted to Oracle Corporation,

8

Microsoft Corporation and Samsung Electronics Co., Ltd.," (*id.* § 1.3), as well as Plaintiff's

9

release of all claims against Acacia relating to the underlying assignment agreement, the

10

encumbrances, and the Returned Patents, (*id.* §§ 2.1-2.3).

11

## II.   LEGAL STANDARDS

12

### A.   Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)

13

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), the burden is

14

on the plaintiff, as the party asserting jurisdiction, to establish that subject matter jurisdiction

15

exists.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  A jurisdictional

16

challenge may be either facial or factual.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  A

17

facial challenge asserts that even if assumed true, "the allegations contained in a complaint are

18

insufficient on their face to invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d

19

1035, 1039 (9th Cir. 2004).  By contrast, "a factual attack . . . disputes the truth of the allegations

20

that, by themselves, would otherwise invoke federal jurisdiction."  *Id.*  Here, Defendants have

21

advanced a factual challenge to the Court's jurisdiction on the premise that the extrinsic evidence

22

contradicts Plaintiff's allegations of patent ownership in the Complaint.

23

Few procedural limitations exist in a factual challenge to a complaint's jurisdictional

24

allegations.  *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989).  The district court is not

25

precluded from considering conflicting evidence and has wide discretion to consider affidavits,

26

documents, and even hold a limited evidentiary hearing.  *See Thornhill Pub. Co. v. Gen. Tel. &*

27

*Electronics Corp.*, 594 F.2d 730, 733 (9th Cir. 1979); *Miller v. Lifestyle Creations, Inc.*, 993 F.2d

28

United States District Court
Northern District of California

1   883 (9th Cir. 1993) (unpublished table decision).  Further, the court need not presume the

2   truthfulness of the plaintiff's allegations.  *White*, 227 F.3d at 1242.  Once the factual basis for

3   jurisdiction is challenged, the plaintiff bears the burden of coming forward with "competent proof"

4   to support his allegations of jurisdiction.  *McNutt v. Gen. Motors Acceptance Corp. of Indiana*,

5   298 U.S. 178, 189 (1936); *see also Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2

6   (9th Cir. 2003) (plaintiff opposing factual 12(b)(1) motion must "furnish affidavits or other

7   evidence necessary to satisfy its burden of establishing subject matter jurisdiction").

8         If, however, the determination of the jurisdictional issue is dependent on the resolution of

9   factual issues going to the merits, the district court must apply the summary judgment standard in

10   deciding the motion to dismiss.  *Safe Air*, 373 F.3d 1035, 1039.

11        **B.    Patent Standing**

12        Standing is a threshold jurisdictional issue, as it is a constitutional requirement pursuant to

13   Article III.  *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1363 (Fed. Cir. 2010) (citing

14   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "A court may exercise jurisdiction

15   only if a plaintiff has standing to sue on the date it files suit."  *Id.* at 1364.  A plaintiff asserting

16   standing for patent infringement must demonstrate "that it held enforceable title to the patent at the

17   inception of the lawsuit."  *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed.

18   Cir. 2003) (citing *Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001)).

19        A party that held title to a patent then assigned that title to another lacks standing to sue for

20   patent infringement.  *Lans*, 252 F.3d 1320, 1328 (plaintiff-inventor, who assigned his patent to a

21   corporation in which he was the sole shareholder and managing director prior to filing the action,

22   lacked standing to sue).  The assignment of patent ownership must be made in writing, 35 U.S.C.

23   § 261, and it is incumbent upon a plaintiff whose standing has been challenged to "come forward

24   with the requisite evidence necessary to establish that an assignment, in writing, of the Intellectual

25   Property took place before the lawsuit was filed."  *Gaia Techs., Inc. v. Reconversion Techs., Inc.*,

26   93 F.3d 774, 780 *amended on reh'g in part*, 104 F.3d 1296 (Fed. Cir. 1996).  Patent assignment

27   agreements are generally interpreted according to governing state law.  *DDB Techs., LLC v. MLB*

28

6

United States District Court
Northern District of California

1  *Advanced Media, LP*, 517 F.3d 1284, 1290 (Fed. Cir. 2008).  However, the specific question of

2  whether an assignment agreement effected an automatic assignment, as opposed to a promise to

3  assign, is a question of federal law.  *Id.*

4      If a plaintiff lacked Article III standing when the complaint was filed, "the suit must be

5  dismissed, and the jurisdictional defect cannot be cured by the addition of a party with standing,

6  nor by the subsequent purchase of an interest in the patent in suit."  *Schreiber Foods, Inc. v.*

7  *Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 (Fed. Cir. 2005) (citing *Paradise Creations*, 315 F.3d

8  1304, 1309 and *Gaia Techs.*, 93 F.3d 774, 780); *see also Abraxis*, 625 F.3d 1359, 1364.

9  **III.    DISCUSSION**

10     Defendants maintain that Plaintiff did not have standing to pursue this patent infringement

11 lawsuit when it filed the complaint on May 30, 2012 because Plaintiff assigned legal title to the

12 patents-in-suit to Acacia in 2010 and did not regain the legal title until April 18, 2014.  Defendants

13 have attached various documents and discovery evidence concerning Plaintiff's agreements with

14 Acacia in support of their motion to dismiss.  (*See generally* Lateef Decl. Exhs.)  In opposition to

15 Defendants' motion, and to the documentary evidence that Defendants introduced in support of

16 their motion, Plaintiff offers declarations from its Managing Director, Keith Keeling, (Keeling

17 Decl.), and Acacia's Vice President of Contracts, Darren Miller, (Miller Decl.).

18     Based on the submitted evidence, Plaintiff makes the following arguments: (1) the

19 assignment to Acacia was never effective because Plaintiff never executed the separate assignment

20 paperwork attached as Exhibit B to the Assignment Agreement, (Pl.'s Opp. 8-11); (2) even if

21 assignment was effective in 2010, Plaintiff unilaterally rescinded the Assignment Agreement on

22 March 30, 2012 due to Acacia's material breach, thereby causing the patent rights to revert back to

23 Plaintiff on that day, (*id.* 11-12, 16-17); and (3) if unilateral rescission was ineffective, Plaintiff

24 and Acacia nevertheless mutually agreed to terminate the Assignment Agreement by, at latest,

25 May 30, 2012, upon which time the assigned patent rights reverted to Plaintiff, (*id.* 12-17).  The

26 Court will address each of these arguments in turn.

27

28

Case No. 12-cv-02773-BLF
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING

1

### A.    Effectiveness of the 2010 Assignment

Although state law generally governs the interpretation of contracts, "the question of whether a patent assignment clause creates an automatic assignment" is a matter of federal law for which this Court looks to the authority of the Federal Circuit.  *DDB Techs.*, 517 F.3d 1284, 1290. Under established precedent, whether an assignment clause is automatic—requiring no further action—or "merely a promise to assign" depends on the language of the contract.  *Id.*  Courts have found that contractual language in the future tense supports a finding that the agreement is simply a promise to assign, whereas language expressing a present intent to assign indicates that the assignment is automatic upon effectuation of the agreement.  *Compare Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1580 (Fed. Cir. 1991) ("will be assigned" indicates an agreement to assign) *with Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000) (contractual language of "shall belong [to assignee] and assignor "hereby conveys, transfers and assigns" indicates an automatic assignment).

Here, Plaintiff argues that Section 1.1 of the Assignment Agreement "clearly contemplates future action to effectuate the assignment" due to the requirement of "Acceptable Completion" as a "precondition to transfer."  (Pl.'s Opp. 9:24-26)  Plaintiff also points to the requirement that Plaintiff execute a "separate Assignment"—Exhibit B to the agreement—and that such separate assignment identifies and is supported by consideration distinct from the underlying agreement. This, argues Plaintiff, demonstrates that the Assignment Agreement was structured to avoid a present assignment of rights, and finding a present assignment would render Exhibit B and its related provisions surplusage.  (*Id.* 9:28-11:5)  Defendants note that the plain language of the assignment provision contradicts Plaintiff's interpretation, and that Exhibit B was likely intended to memorialize the assignment in a document that could be publicly recorded with the Patent Office.  (Def.'s Reply, 2:14-3:23)  The Court agrees with Defendants.

Section 1.1 of the Assignment Agreement states that, "[e]ffective *immediately* upon the date of Acceptable Completion . . . Assignor *assigns, conveys, transfers and sells* to APAC . . . the entire right, title, and interest" to the Patents.  (Assignment Ag. § 1.1 (emphasis added))  Although

8

1    Acceptable Completion was a precondition to effective assignment, this does not necessarily mean

2    that Plaintiff merely made a promise to assign.  The unambiguous language of the assignment

3    provision makes assignment automatic ("effective immediately") once Acceptable Completion is

4    triggered.  Furthermore, in contrast to the language in *Arachnid* that indicated only an agreement

5    to assign, 939 F.2d 1574, 1580, the language of the agreement here provides that upon Acceptable

6    Completion, Plaintiff "assigns, conveys, transfers and sells" its patent rights to Acacia.  This

7    wording indicates that no further action is required from Plaintiff to effectuate the assignment of

8    patent rights.  Thus, assignment became automatic when Acacia triggered "Acceptable

9    Completion" on December 17, 2010 by way of written notice pursuant to Section 1.3 of the

10   agreement.  (Lateef Decl. Exh. 19)  The parties' conduct thereafter confirms that such was their

11   mutual understanding of the December 17, 2010 letter from Acacia to Plaintiff.  (*See* Lateef Decl.

12   Exhs. 16-18)

13        The provision regarding execution of a separate assignment does not require a contrary

14   holding.  Plaintiff was under an obligation to execute and deliver the separate assignment in

15   Exhibit B "and such other documents as APAC (or APAC's designated Affiliate) shall reasonably

16   require *in order to comply with the terms set forth in this Agreement*."  (Assignment Ag., § 1.1

17   (emphasis added))  Similar language frequently arises in inventor-assignment agreements, wherein

18   the inventor-assignor assigns title to future inventions that are automatic upon patenting, but the

19   inventor also promises to assist the assignee in perfecting title through execution of specific

20   assignments.  Courts have determined that such language does not conflict with clear language of

21   a present, automatic assignment.  *See DDB Techs.*, 517 F.3d 1284, 1290 n.3 (contractual language

22   that "Employee agrees to execute specific assignments and do anything else properly requested by

23   [assignee], at any time during or after employment with [assignee], to secure such rights" did not

24   conflict with "the clear language of the present, automatic assignment provision"); *Shukh v.*

25   *Seagate Tech., LLC*, No. CIV. 10-404 JRT JJK, 2011 WL 1258510, at *6 (D. Minn. Mar. 30,

26   2011) (similar language does not conflict with clear language of present, automatic assignment).

27   Read in context, the separate assignment requirement does not operate as a condition precedent to

28
9

Case No. 12-cv-02773-BLF
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING

1    effective assignment, but rather as part of Plaintiff's obligation to perform under the Assignment

2    Agreement.  As such, it does not conflict with the clear language of present, automatic assignment

3    effective on the date of Acceptable Completion.

4          The Court therefore finds that Plaintiff's assignment of legal title to the patents-in-suit

5    became effective on December 17, 2010, and that Acacia held legal title from that date forward.

6          **B.    Unilateral Rescission of the Agreement on March 30, 2012**

7          Perhaps anticipating the Court's finding of an effective assignment in 2010, Plaintiff

8    suggests in the alternative that even if the patents-in-suit were effectively assigned to Acacia in

9    2010, legal title reverted to Plaintiff on March 30, 2012 when it unilaterally rescinded the

10   Assignment Agreement.  (*see* Pl.'s Opp. 11-12:28)  Plaintiff argues that it was entitled to

11   unilaterally rescind the Assignment Agreement because "Acacia failed to make even minimal

12   efforts to monetize the patents," thereby materially breaching the agreement.  (*Id.* 12:2; Keeling

13   Decl. ¶¶ 6-7)  Under this theory of unilateral rescission, Plaintiff argues that its March 30, 2012

14   termination letter "was sufficient to terminate the Agreement under Texas law."  (Pl.'s Opp.

15   12:27-28)  The Court need not reach the collateral issue of Acacia's alleged material breach

16   because Plaintiff's theory of unilateral rescission is legally flawed.  (*See* Def.'s Reply 9:17-10:14)

17         Under Texas law, "[r]escission is an equitable remedy that operates to set aside a contract

18   that is legally valid but is marred by fraud, mistake, or for some other reason, *the court* must set it

19   aside to avoid unjust enrichment."  *Humphrey v. Camelot Ret. Cmty.*, 893 S.W.2d 55, 59 (Tex.

20   App. 1994) (emphasis added).  The Federal Circuit, interpreting Texas law, previously rejected an

21   argument for unilateral rescission very similar to Plaintiff's, finding that "Texas case law indicates

22   that a party must seek the aid of a court in order to obtain cancellation or rescission of an

23   assignment, thus obtaining reassignment of title."  *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109

24   F.3d 1567, 1578 (Fed. Cir. 1997).  Plaintiff has not identified any contrary case law that would

25   permit a party to a written assignment agreement unilaterally to declare the agreement null and

26   void and, without court intervention, cause the legal ownership of the patents covered by the

27   agreement to revert to itself.  *See id.* ("As far as Texas law generally is concerned, we have found

28

10

United States District Court
Northern District of California

1   no authority to support the proposition that, following a breach of the assignments, the plaintiff

2   could unilaterally declare the agreements null and void and thereby reobtain ownership of the

3   patents that are covered by the assignments.").

4          Thus, in the absence of any evidence of court-ordered rescission, the Court rejects

5   Plaintiff's argument that legal title to the patents-in-suit reverted to Plaintiff on March 30, 2012,

6   when it attempted to unilaterally terminate the Assignment Agreement.

7          **C.    Mutual Rescission of the Agreement on or before May 30, 2012**

8          Plaintiff's third argument in support of patent standing rests on the doctrine of mutual

9   rescission.  (*See* Pl.'s Opp. 12:27-16:8)  Under Texas law, "parties may rescind their contract by

10   mutual agreement and thereby discharge themselves from their respective duties." *Texas Gas*

11   *Utilities Co. v. Barrett*, 460 S.W.2d 409, 414 (Tex. 1970).  "[R]epudiation of a contract by one

12   party rescinds the contract when such repudiation is accepted by the other party." *Santa Fe*

13   *Petroleum, LLC v. Star Canyon Corp.*, 156 S.W.3d 630, 638 (Tex. App. 2004).  Such mutual

14   rescission need not be in writing, but may be proven by clear evidence of an express oral

15   agreement or of a tacit agreement inferred from the parties' course of conduct indicating a mutual

16   understanding that the agreement is terminated.  *Texas Gas Utilities*, 460 S.W.2d 409, 414-15; *see*

17   *also* 14 Tex. Jur. 3d Contracts § 283.  Clear evidence of rescission through course of conduct "is

18   not supportably shown in the fact that a party is silent after being notified of a repudiation by the

19   other contracting party and thereafter acts in self protection by taking steps to mitigate damages."

20   *Texas Gas Utilities*, 460 S.W.2d 409, 415.  For purposes of this motion, and because it was not

21   briefed by the parties, the court will assume without deciding that rescission of a patent

22   assignment agreement may occur by operation of state law and is not required by federal law to be

23   in writing.

24          Here, Plaintiff argues that Acacia accepted its March 30, 2012 repudiation of the

25   Assignment Agreement both expressly, by "verbally indicat[ing] that the agreement was

26   terminated," and tacitly, by "discontinuing performance under the contract."  (Pl.'s Opp. 16:4-6)

27   Plaintiff does not identify a specific date of rescission, but suggests that it occurred in "April and

28

Case No. 12-cv-02773-BLF
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING

United States District Court
Northern District of California

1    May of 2012," (*id.* 4:9), after which the parties "entered into discussions to commit the

2    termination to writing," (*id.* 16:5-6).  Defendants predictably reject both of these theories of

3    mutual rescission and object to the evidence that Plaintiff offered in support of its position.  (*see*

4    Def.'s Reply, 11-13)

5                    **i.    Evidentiary Objection**

6            Before turning to the merits of the parties' arguments, the Court must rule on Defendants'

7    timely hearsay objection to portions of Mr. Keeling's testimony that Plaintiff relies on in support

8    of its mutual rescission argument.  (Def.'s Reply 11:16-19)  At the June 5, 2014 hearing, the Court

9    requested supplemental briefing from Defendants to clearly identify the objectionable statements.

10   Plaintiff was given an opportunity to respond to these objections, and the parties completed

11   supplemental briefing on June 10, 2014.  (Def.'s Evid. Obj., ECF 87; Pl.'s Resp., ECF 89)

12           Defendants object to the following statements from Mr. Keeling's declaration as

13   inadmissible hearsay evidence of Acacia's purported verbal acceptance of Plaintiff's repudiation:

14                   "In April and May 2012, Acacia agreed to terminate and discontinue
                     performance under the Agreement."  (Keeling Decl. ¶ 8)
15
                     "Acacia discussed with Dominion memorializing in writing the
16                   agreement to terminate."  (*Id.*)

17                   "During those discussions, Acacia communicated that it wished to
                     terminate the agreement and that it would discontinue performance
18                   per our wishes."  (*Id.* ¶ 9)

19   Defendants also object to portions of Mr. Keeling's deposition testimony at 253:30-254:3, 254:4-

20   12, and 256:16-17 as hearsay evidence of Acacia's oral acceptance.  (Def.'s Evid. Obj. 1:4-14)

21           Plaintiff contends that these statements are not hearsay within the definition of Federal

22   Rule of Evidence 801 because they are not offered for the truth of the matter asserted.  (Pl.'s Resp.

23   2:1-14)  Plaintiff argues that the significance of Mr. Keeling's testimony concerning Acacia's

24   verbal statements of acceptance "lies solely in the fact that these statements were made," which

25   therefore brings them into the category of non-hearsay "verbal acts."  (*Id.* 2:4-5)

26           The Court agrees with Plaintiff that Mr. Keeling's testimony concerning Acacia's verbal

27   acceptance is not hearsay, but rather relevant evidence of the fact that Acacia made such

28
                                                        12

United States District Court
Northern District of California

1   representations.  As such, Defendants' hearsay objections are overruled.

2          ii.      **Mutual Rescission**

3          The parties have both submitted evidence and declarations containing facts relevant to the

4   jurisdictional question of Plaintiff's standing to file suit on May 30, 2012.  Moreover, the parties

5   do not dispute the relevant jurisdictional facts, but rather the proper interpretation of those facts.

6   Thus, no evidentiary hearing is required, as the Court need only determine whether the undisputed

7   facts demonstrate mutual rescission of the Assignment Agreement.

8          Both of Plaintiff's theories of mutual rescission—verbal and tacit—rely on essentially the

9   same evidence, and the Court will accordingly address both theories together.  The undisputed

10  facts are that Plaintiff sent Acacia a written letter of termination in March 30, 2012, after which

11  Plaintiff's Managing Director, Keith Keeling, and Acacia's Business Development Manager,

12  Michael Zhang, exchanged communications about proposed language for a termination agreement.

13  (Lateef Decl. Exhs. 17-18, 20, 22)  Mr. Keeling and Acacia's Vice President of Contracts, Darren

14  Miller, both testified in general terms that some agreement relating to termination was reached by

15  May 30, 2012.[5]  (Keeling Decl. ¶¶ 8-9; Miller Decl. ¶ 3)  However, Acacia and Plaintiff did not

16  sign the written Termination Agreement until 2014.  (*See* Term. Ag.)  Based on this evidence, the

17  Court can at most infer that as of May 30, 2012 the parties had an agreement to negotiate a

18  termination agreement.

19         The devil is in the details, and Plaintiff does not offer any concerning Acacia's alleged

20  verbal agreement to terminate the Assignment Agreement.  Plaintiff relies on Mr. Keeling's

21  declaration to establish its case, but Mr. Keeling's own statements in his declaration, supporting

22  exhibits, and in his deposition and interrogatory responses are internally inconsistent and, in

23  important regards, contradictory as to the actual date of termination.  Of particular concern is Mr.

24  Keeling's declaration testimony that "[i]n April and May 2012, Acacia agreed to terminate and

25

26  _____

27  [5] Although Defendants objected to the admissibility of Plaintiff's evidence on this point,
    Defendants did not adduce any direct evidence contradicting the declarants' testimony that some
    agreement was reached by May 30, 2012.

28  
Case No. 12-cv-02773-BLF
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING

1    discontinue performance under the Agreement." (Keeling Decl. ¶ 8)  This statement is

2    inconsistent with both Mr. Keeling's deposition testimony given on April 15, 2014, and with the

3    Corrected Second Supplemental Response to Defendants' First Set of Interrogatories that Mr.

4    Keeling verified the day prior to his deposition, wherein he testified that the termination occurred

5    on May 30, 2012.  (*See* Keeling Dep. 254:4-10; Lateef Decl. Exh. 23 (Pl.'s 2nd Supp. Resp. to

6    Defs.' Interrog. No. 3))

7            More problematic is Mr. Keeling's inability to testify whether Acacia specifically agreed

8    to *rescind* the agreement.  When asked to recall what Michael Zhang specifically said on May 30,

9    2012 to verbally accept termination, Mr. Keeling testified: "I don't remember.  I mean, it was just

10   too long ago.  He just acknowledged the – the termination.  And probably on more than one

11   occasion.  I don't remember exactly what he said." (Keeling Dep. 256:11-257:1)  When pressed

12   on the details, Mr. Keeling testified that he thought termination was accepted on May 30 because

13   he recalls the "spirit of the conversation."  (*Id.* 256:22).  Mr. Miller's testimony is no better, as he

14   does not appear to have personal knowledge of the events, and testifies only that "by May 30,

15   2012, Acacia determined that Dominion had no desire for Acacia to continue its performance

16   under the agreement and Acacia complied with its request."  (Miller Decl. ¶ 3) [6]  There is no

17   testimony in the record from Mr. Zhang, and Plaintiff has not explained why Mr. Zhang cannot

18   testify concerning his communications with Mr. Keeling about terminating the Assignment

19   Agreement.  In short, there is no evidence of what was actually said between Plaintiff and Acacia

20   and thus no evidence that Acacia agreed to immediately rescind the Assignment Agreement, as

21   opposed to agreeing to negotiate a termination agreement.

22           In fact, the parties' conduct belies Plaintiff's assertion that mutual rescission was effective

23   by May 30, 2012.  The email exchange between Mr. Keeling and Mr. Zhang shows that as late as

24   April 30, 2012 Acacia was still trying to transmit its proposed "language for terminating our

25

26   [6] Defendants note that Mr. Miller was not identified in any of Plaintiff's initial disclosures or
     discovery responses, and that Defendants have not had an opportunity to depose him.  (Def.'s
27   Reply, 8 n.1, 11:2-3)

28
                                                    14
     Case No. 12-cv-02773-BLF
     ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING

United States District Court
Northern District of California

United States District Court
Northern District of California

1   original assignment agreement." (Lateef Decl. Exh. 17)  On May 4, 2012, Mr. Zhang nudged Mr.

2   Keeling about the written proposal, stating: "Keith, I am still waiting on a signed copy for our

3   CEO to sign to put the language in place." (*Id.* Exh. 22)  The contracting parties even scheduled a

4   conference call for May 30, 2012 to address Plaintiff's continued reservations about the

5   termination language. (*Id.* Exh. 20)  Far from merely acquiescing to Plaintiff's repudiation, it is

6   evident that Acacia insisted on a written termination agreement throughout the discussions

7   regarding termination.  Moreover, Acacia's termination proposal included material terms above

8   and beyond mere rescission of the Assignment Agreement: Acacia requested (1) that Plaintiff

9   release all claims against Acacia and (2) that Plaintiff accept encumbrances that Acacia may have

10  placed on the patents-in-suit.  These terms are inconsistent with the notion that Acacia agreed to

11  rescind and cause the survival clause of the Assignment Agreement to govern. (*See* Assignment

12  Ag. ¶ 9.7 ("Upon termination of this Agreement, the rights granted to APAC shall automatically

13  terminate and such rights shall revert to Assignor."))  By Plaintiff's own admission, Acacia's

14  insistence on these terms, and in particular the encumbrances provision, proved to be the

15  stumbling block to concluding the negotiations in May 2012. (*See* Keeling Decl. ¶¶ 8, 11)  Those

16  negotiations did not conclude until April 2014, when Plaintiff and Acacia finally signed the

17  Termination Agreement.

18          Plaintiff suggests that Acacia's "discontinued performance," failure to object to

19  termination, and failure to object to the instant lawsuit is sufficiently competent evidence of an

20  "election of remedies" indicating Acacia's assent to Plaintiff's repudiation. (Pl.'s Opp. 16:2-8; *see*

21  *also* Keeling Decl. ¶ 10)  This argument fails for several reasons.  First, as already discussed,

22  Acacia did not fail to object to termination—it insisted on written terms that are inconsistent with

23  rescission.  Second, Mr. Keeling has admitted that he did not inform Acacia of Plaintiff's lawsuit

24  against Defendants. (Keeling Dep. 264:5-17)  Third, Plaintiff's argument for repudiation in the

25  first instance was that Acacia failed to perform on the Agreement, so it would be difficult to infer

26  from a baseline of no performance that Acacia had "discontinued performance." (Pl.'s Opp.

27  11:20-12:24; Keeling Decl. ¶ 6)  Finally, Plaintiff's argument disregards that Acacia is permitted

28

15

to "act[] in self protection by taking steps to mitigate damages." *Texas Gas Utilities*, 460 S.W.2d 409, 415. Thus, Acacia's compliance with what it had determined to be Plaintiff's desire for it to stop performance, (*see* Miller Decl. ¶ 3), and its failure to bring a subsequent enforcement action against Defendants is not competent evidence of Acacia's "election" to accept repudiation.

Plaintiff's evidence ultimately fails because none of Plaintiff's witnesses are able to explain why the Termination Agreement is unambiguously written in present and prospective terms with no mention of any prior agreement or rescission. The most compelling evidence of Plaintiff and Acacia's intent can be found in the recitals to the Termination Agreement, which state that Acacia "desires to transfer and convey to Dominion all of its interests [in the covered patents]" and that the "Parties desire to terminate the Patent Assignment Agreement." (Term. Ag., at 1) Such expressions of a present intent to terminate and transfer imply that the Agreement was still in effect. Nowhere in the Termination Agreement is it stated or even suggested that the agreement "memorialize[s] the 2012 termination." (Keeling Decl. ¶ 12) In fact, the Termination Agreement unambiguously states that the Assignment Agreement is terminated "[a]s of the Effective Date," defined as "the date on which the last Party executes this Agreement." (*Id.* § 1.1) The last party executed the Termination Agreement on April 18, 2014.

To be sure, it is undisputed that Plaintiff now owns the patents-in-suit. It is also undisputed that Acacia relinquished its rights to past damages in the Termination Agreement such that it is unlikely Defendants will now be threatened with "the possibility of paying damages to different parties for the same infringement." *Mabbett v. Tandy Corp.*, 847 F.2d 841 (Fed. Cir. 1988) (unpublished table decision). However, that latter fact was less than certain in 2012, when Plaintiff refused to accept Acacia's encumbrances on the patents-in-suit until it was "satisfied that Defendants, the sole infringers of the now expired patents, had not been licensed as part of any Acacia portfolio-wide license." (Keeling Decl. ¶ 11) There was thus a chance in 2012 that Plaintiff, by filing this lawsuit, had placed Defendants in the untenable position of being found liable for licensed conduct. Such potential for uncertainty is the concern animating the requirement that a patent plaintiff demonstrate that he possesses the exclusive right to a patent at

Case No. 12-cv-02773-BLF
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING

United States District Court
Northern District of California

1   the inception of suit.  *See Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1279 (Fed.

2   Cir. 2007) (discussing *Waterman v. Mackenzie*, 138 U.S. 252 (1891)).

3           Based on the foregoing, the Court concludes that Plaintiff has not supplied competent

4   evidence showing that the Assignment Agreement was mutually rescinded in 2012 such that

5   Plaintiff possessed legal title to the patents-in-suit on the date it filed this lawsuit.  Because

6   Plaintiff has not made the required showing, the Court finds that Plaintiff lacked standing to file

7   this lawsuit on May 30, 2012, and the case must accordingly be dismissed.

## IV.    ORDER

9           For the foregoing reasons, the Court concludes that Plaintiff has failed to establish that it

10  had standing to bring this lawsuit for patent infringement.  While it is undisputed that Plaintiff

11  now holds legal title to the patents-in-suit, Plaintiff has not satisfied its burden to demonstrate that

12  it held legal title at the inception of this lawsuit on May 30, 2012.  Accordingly, Defendants'

13  Motion to Dismiss For Lack of Standing is GRANTED, without leave to amend.  The case is

14  dismissed without prejudice to the extent that this ruling does not bar Plaintiff from asserting a

15  patent infringement claim against Defendants now that it holds legal title.

16          The Clerk of the Court is instructed to close the file in the case.

18  Dated: June 27, 2014

20  BETH LABSON FREEMAN
    United States District Judge

United States District Court
Northern District of California

Case No. 12-cv-02773-BLF
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING